**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| COY'S HONEY FARM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | MDL No.:1:18-md-02820-SNLJ |
| | ) | |
| v. | ) | Case No. 1:21-CV-089-SNLJ |
| | ) | |
| BAYER CORPORATION; BAYER | ) | |
| U.S., LLC; BAYER CROPSCIENCE | ) | |
| Arkansas Inc.; BASF CORPORATION; | ) | |
| and BASF SE | ) | |
| | | |
| Defendants. | | |

## <u>MEMORANDUM AND ORDER</u>

Plaintif Coy's Honey Farms, Inc., is a beekeeping and honey-producing operation based near Jonesboro, Arkansas.  Plaintiff alleges that dicamba-based herbicide products, including those produced by defendants Monsanto and BASF[1], moved away from the targeted dicamba-tolerant ("DT") plants and damaged non-tolerant vegetation surrounding plaintiff's beekeeping operation.  Plaintiff alleges this resulted in reduced honey production and loss of bees.

Plaintiff moves to exclude the expert testimony of Drs. Eric P. Webster and Dwayne Moore.  [Docs. 55 and 56].  Plaintiff also moves to exclude testimony about collateral source benefits received by plaintiff as an off-set to damages.  [Doc. 57].

Defendants move to exclude the expert testimony of Drs. James Nieh and Ford

---

[1] Named defendants are BASF Corporation, BASF SE, Bayer Corporation, Bayer U.S., LLC, and Bayer Cropscience Arkansas Inc.  Monsanto was acquired by Bayer during the course of this MDL. The Court will refer to the defendants as BASF and Monsanto for clarity.

Baldwin.  [Docs. 58 and 62].  Each of these matters is fully briefed.

## I.   Expert Testimony

### A.  Legal Standard

Federal Rule of Civil Procedure 702 states in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 703 clarifies the boundaries of such expert testimony to cover both "facts or data in the case that the expert has been made aware of or personally observed."  Thus, the expert need not have personally witnessed the phenomenon to provide an opinion.  *See also, Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  The expert should base his opinion on "sufficient facts or data" according to "reliable principles and methods" such that it reflects "reliable application of the principles and methods" of his trade.  Fed. R. Evid. 702.

The Supreme Court highlights other factors to be considered.  These include (1) whether the information can be and has been tested, (2) whether the theory or technique has been subject to peer review and publication, (3) what the potential rate of error is, and (4) whether standards and controls were maintained.  *Daubert*, 509 U.S. 579, 593-594.

2

Although "general acceptance" is not required, the court may, nonetheless, consider it as well. *Id*. at 594. Notably, this inquiry is "a flexible one," and no single factor is dispositive. *Id*. at 594. *See* Fed. R. Evid. 702, Comment.

The Eighth Circuit also has established a three-part test for judges to determine whether expert testimony is admissible in applying Rule 702. *Polski v. The Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008). First, evidence must be useful to deciding the ultimate issue of fact. Second, the witness must be qualified. Third, evidence should be reliable or trustworthy. *Id*. The Eighth Circuit has also held that Rule 702 "clearly is one of admissibility rather than exclusion." *Id*. *See*, *Lauzon v. Senco Products, Inc.*, 270 F.3d 681 at 686 (8th Cir. 2001) (internal quotation omitted).

The expert does not have to testify on final issues of a case: "It might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702, Comment. Proffered testimony merely must "fit" the case and be relevant to some issue in question. *Id*.

Once a motion to exclude expert testimony has been made, the burden of proof shifts to the party seeking admission. The proponent of the evidence must show that "the proffered expert's methodology is both scientifically valid and applicable to the case." *Bland v. Verizon Wireless, (VAW), L.L.C.*, 538 F.3d 893, 896 (8th Cir. 2008). Admissibility should be shown by a preponderance of the evidence. *Daubert,* 509 U.S. at 592; *see Polski v. The Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008).

3

**B.    Eric P. Webster, Ph.D. [Doc. 55]**

### 1.  Dr. Webster's Background

Defendants' expert Dr. Eric P. Webster is a weed scientist who specializes in the "biological response of plants to herbicides," "weed management," and pesticides.  [Docs. 62-3 and 70-1].  He belongs to numerous academic societies for weed science, and he taught at both Louisiana State University and the University of Arkansas before becoming the Associate Dean for Research and Director of the Wyoming Agricultural Experiment Station at the University of Wyoming.  [Doc. 62-3 and 70-1].

### 2.  Motion to Exclude [Doc. 55]

Plaintiff argues that Dr. Webster's testimony should be excluded for three reasons.  First, Dr. Webster has not extensively studied over-the-top (OTT) dicamba.  [Doc. 55 at 7-8].  Plaintiff alleges that Dr. Webster's experience with dicamba was limited to "burn down," which is the period before planting, and the alleged injury in this suit took place after planting, that is, over the top of growing plants.  [Doc. 55 at 8].

Defendants respond that Dr. Webster has experience with herbicides generally, and he focuses on the entire class of auxin herbicides, which includes dicamba.  [Doc. 70 at 13].  Indeed, it is clear from his testimony that Dr. Webster carefully examines plants to rule out dicamba as part of his diagnostic procedure.  [Doc. 70-1].  Dr. Webster's experience with auxin herbicides generally is sufficient to show he has experience with dicamba, which is a subclass of those auxin herbicides.

Second, plaintiff argues that Dr. Webster lacks personal and direct exposure to or knowledge of the geography, climate, soil conditions, and plants of East Arkansas because

4

he has not studied in the state since 1997.  [Doc. 55 at 8-10].  Plaintiff seems to mistakenly believe that an expert witness needs to have personally experienced the geographic conditions to testify on them.  Although this is true for a typical witness, an expert witness need not have personally witnessed the events in question.  Fed. R. Evid. 703. *See Daubert*, 509 U.S. 579 at 592.

Defendants add that if plaintiff's position is the standard, then none of the proposed expert witnesses are qualified to testify and that summary judgment should be awarded to the defendants.  [Doc. 70 at 11].  The Court reiterates: experts do not have to have personally witnessed the circumstances of the case to be qualified to testify.  Instead, experts merely must base their expert opinions on sufficient facts and data.

Third, plaintiff argues that Dr. Webster's critiques of plaintiff's experts Drs. Baldwin and Bradley are "not scientifically based" because Dr. Webster claims to do "the opposite of everyone else."  [Doc. 55 at 10-13].  In response, defendants explain that Dr. Webster was actually contrasting his behavior with non-experts like "growers" or "field rep[s]" rather than the scientific community as a whole, who have a predetermined bias of the situation.  [Doc. 70 at 9].  Defendants' analysis is consistent with the context of the questioned testimony.

Defendants further argue that because Dr. Webster is a rebuttal expert, he does not have the burden of proof.  Instead, he merely opines on the plaintiff's scientific experts' methods.  [Doc. 70 at 11-12].  Dr. Webster, therefore, does not have to use the exact same methodology as all other weed scientists so long as his approach is scientific and based in the scientific method.  Fed. R. Evid. 702.; Fed. R. Evid. 703; *Daubert*, 509 U.S. at 593-

5

594; *See Lauzon*, 270 F.3d at 686.  In any event, defendants note that Dr. Webster's methodology "closely align[s]" with Drs. Baldwin and Bradley.  [Doc. 70 at 16].

### 3.  Conclusion

Applying the *Polski* factors, this Court finds that Dr. Webster's proffered testimony is admissible.  *Polski*, 538 F.3d 836 at 839.  First, the evidence helps the factfinder to determine which method of weed and herbicide analysis is better and most reliable.  *Id*. Second, the witness is qualified to testify as an expert.  With decades of experience in the methodology of weed and herbicide identification, he does not have to have been to Arkansas to opine on methodologies generally.  *Id*.  Finally, the evidence is reliable and based on sufficient study and appropriate methodology that the court believes it could reasonably be deemed trustworthy.  *Id*.  *See,* [Doc. 70].  Considerations about whether Dr. Webster's methodology is better or worse than Drs. Bradley and Baldwin may be addressed by thorough cross examination.

### C.    Dwayne Moore, Ph.D. [Doc. 56]

#### 1.    Dr. Moore's Background

Defendants' witness Dr.  Dwayne Moore is an "ecotoxicologist."  [Doc. 72 at 1]. He has expertise "in ecological and endangered species risk assessments for pesticides and industrial chemicals, wildlife exposure modeling, pollinator risk assessment, development of water quality guidelines and criteria for protection of aquatic life, community ecology, statistics, uncertainty analysis, and analysis of toxicity data."  [Doc. 56 at 2].  He has spent the last 34 years as an ecological risk assessor.  [Doc. 72-1 at 3].

Plaintiff alleges that Dr. Moore's career has mostly taken place in Canada.  He

6

earned his degrees from universities in Ontario.  [Doc. 62 at 5].  His career has included working for Environment Canada, The Cadmus Group, and Intrinsik Environmental Sciences.  He now works for Stone Environmental in Montpelier, Vermont, from his home in New Glouchester, Maine, where he continues to do ecological risk assessments of pesticides.  *Id.*  Dr. Moore states, however, that he has also done extensive work and research for the United States government.  [Doc. 72-1 at 3-4].  This research has given him experience reviewing studies and research performed by others.  *Id.*  at 2-4.

Dr. Moore's proposed testimony in this case is to "evaluate and respond to the reports and opinions that were provided by plaintiff's experts."  *Id.* at 1.  He is not presenting any original research or studies related to dicamba.  *Id.*

## 2.  Motion to Exclude [Doc. 56]

Plaintiff makes three main arguments about why Dr. Moore's testimony should not be admitted.  First, plaintiff argues that Dr. Moore is entirely unfamiliar with Arkansas's geography and the growing conditions of its vegetation.  [Doc. 56 at 5-7].  Plaintiff states that although Dr. Moore was once in Arkansas for a scientific workshop, and he visited in 2004 for personal pleasure, Dr. Moore has never visited the areas around plaintiff's beehives.  [Doc. 56 at 5].  Plaintiff emphasizes that even Dr. Moore himself stated, "I don't know anything specific about eastern Arkansas or Arkansas in general about whether the temperature inversions there are more frequent or less frequent that in surrounding states."  [Doc. 56 at 6].

In response, defendants assert that Dr. Moore did not need to be personally familiar with eastern Arkansas in order to read and analyze the United States Environmental

Protection Agency's (EPA) findings pertaining to dicamba. [Doc. 72 at 6]. *See Daubert*, 509 U.S. 579. Because the plaintiff has not questioned the EPA's findings, defendants assert that Dr. Moore did not need to provide any independent research to further support the findings. [Doc 72 at 7]. Moreover, because Dr. Moore is merely testifying to the methodology used by plaintiff's experts and the studies they cite rather than original dicamba research, he only needs to demonstrate expertise in understanding in reading reports and understanding how they arrived at their various conclusions. *Id*.

Defendants demonstrate the reliability of Dr. Moore's testimony by showing it is based on his experiences with ecotoxicology, including reading and analyzing reports. [Doc. 72 at 10-11]. Defendants conclude that any questions regarding Dr. Moore's analysis should be considered through cross examination. [Doc. 72 at 8]. This Court agrees that cross examination is the proper place to address the sorts of concerns plaintiff raises in the first point.

Second, plaintiff argues that Dr. Moore lacks knowledge about dicamba, and therefore cannot be a qualified expert in this suit. [Doc. 56 at 7-9]. Dr. Moore's prior experience has focused on designing studies and reviewing statistics, but he has not had much experience with Dicamba until the last few years. [Doc. 56 at 7]. In particular, Dr. Moore's dicamba studies did not involve studying volatility. *Id*. Plaintiff further alleges that no studies have been done to evaluate dicamba's effect on ecology in Arkansas, so there are no relevant studies for Dr. Moore to present. *Id*. at 8.

Defendants respond that Dr. Moore has an extensive academic background that has exposed him not only to dicamba research, but to research regarding several other potential

8

herbicides and pesticides that might cause damage in eastern Arkansas and look similar to dicamba damage.  [Doc. 72 at 5].  Defendants further emphasize that Dr. Moore has significant recent experience with dicamba as well.  [Doc. 72 at 6].  Dr. Moore's expertise is clearly not limited to dicamba, but rather to a variety of other herbicides and pesticides as well.  [Doc. 72 at 4-5].  Defendants conclude that "Moore's testimony and opinions relate to topics that are firmly within his expertise and he is well-qualified to offer the opinions in his report."  [Doc. 72 at 8].  This Court agrees that Dr. Moore is qualified to testify on these topics.

Finally, plaintiff argues that the evidence is not relevant under Rule 403 because Dr. Moore himself has not researched dicamba use in eastern Arkansas or its impact on native vegetation or pollen production.  [Doc. 56 at 9-10].  Although couched as a relevancy issue, plaintiff's real complaint is that Dr. Moore is unqualified to testify as an expert. [Doc. 56 at 10].

In any event, defendants reply that Dr. Moore's testimony is offered in rebuttal to plaintiff's witnesses and is therefore relevant for contradicting plaintiff's testimony.  [Doc. 72 at 8].  Simply put, Dr. Moore is testifying that dicamba is nontoxic for bees, and legal usage of dicamba did not and could not cause widespread landscape damage.  [Doc. 72 at 8].  Defendants believe Dr. Moore's testimony will aid the factfinder in understanding defendants' alleged gaps in plaintiff's experts' testimony by means of an alternative perspective.  [Doc. 72 at 10].

### 3.  Conclusion

The Court once again analyzes the arguments according to the *Polski* standards.  The

9

expert testimony relates to an ultimate fact issue to the extent that plaintiff is required to prove that dicamba caused damages to its beekeeping operations. *See*, *Polski* 538 F.3d 836 at 839. Dr. Moore testifies in contradiction of that argument. Second, Dr. Moore is an expert in the fields of ecotoxicology, scientific study, and methodology, which are the subjects of his testimony. The Court finds he is qualified to testify on studies about Arkansas without ever having visited the relevant parts of Arkansas because his academic pursuits center around scientific studies and the interpretation of their results. *Id.* Finally, his testimony is sufficiently reliable and trustworthy so as to be admitted, because it is rooted in traditional methods and practices. *Id.* Concerns about which expert's methodology and interpretation is the best should be addressed on cross examination.

### D.    James Nieh, Ph.D. [Doc. 58]

#### 1. Dr. Nieh's Background

Plaintiff's witness James Nieh, Ph.D., has been studying honeybees for more than 30 years after receiving his A.B. from Harvard University and his Ph.D. from Cornell University. He focuses specifically on honeybee behavior. [Doc. 58-1 at 1].

#### 2. Motion to Exclude [Doc. 58]

Defendants make two broad arguments for why Dr. Nieh's testimony should be excluded. First, they say the testimony does not assist the trier of fact determine a fact in issue. Second, they say that his methodology is unreliable. [Doc. 58 at 1].

Defendants do not believe that Dr. Nieh's testimony is helpful, because it does not determine which dicamba product—whether XtendiMax, Engenia, or some other product—actually harmed or effected the health of plaintiff's bees. [Doc. 58 at 3, 8]. This

is because Dr. Nieh's testimony focuses on dicamba generally, and thus cannot be traced back to XtendiMax or Engenia specifically. *Id*. at 9. Moreover, the testimony highlights chronic dicamba usage's effects on non-bee insects rather than focusing on isolated incidents on bees. *Id*. at 10.

Defendants mischaracterize Rule 702 as requiring that testimony decide an "ultimate issue of fact." [Doc. 58 at 8] (emphasis added). The rule, however, only requires that the evidence help the fact finder to "determine a fact in issue." Fed. R. Evid. 702. Testimony may be about general principles relevant to the issues of the case. Fed. R. Evid. 702, Comment; *see supra*, at 3. Although the *Polski* factors use the term "the ultimate issue of fact," the rule is rather focused on "the basic rule of relevancy" rather than causation. *See Polski* 538 F.3d 836 at 839.

In response, plaintiff argues that Dr. Nieh's testimony will be limited to "(i) the physiology, society structure and foraging practices of bees for food; (ii) the sources and types of food consumed by bees; and (iii) the effect on bees of the lack of sufficient food supply." [Doc. 76 at 2]. Plaintiff argues that this background information is necessary for the fact finder to rule in this case. *Id.* at 5. The plaintiff believes it is especially important that the factfinders know what kind of plants bees forage on, especially wild plants. Plaintiff also argues that the territorial range of a bee is also important to the fact finder "due to the claim that volatilization from the defendants' Dicamba Herbicides affects a wide area of vegetation." *Id*. at 5-7. This Court agrees that these could all be potential facts relevant to the effect of alleged dicamba drift and its effect on bees, so Dr. Nieh will be allowed to testify on them as relevant. *See* Fed. R. Evid. 702.

The defendants' second broad argument is that the testimony Dr. Nieh presents is attenuated, and his methodology is unreliable. Defendants highlight the parts of Dr. Nieh's own testimony where he discusses the numerous factors that can influence bees and the importance of rigorous research. [Doc. 58 at 3-4]. They seem to think that because more research is needed, Dr. Nieh's testimony is entirely invalid. They further allege that Dr. Nieh did not consider any of these other factors or rule them out. *Id*. at 4. They say that for Dr. Nieh's testimony to be admissible under his own methodology, substantially more data would need to exist and be analyzed. *Id*.

Defendants are especially concerned about Dr. Nieh's lack of prior experience with dicamba, seeing it as a necessary part of any witness's testimony in this suit. *Id*. at 5. His entire experience with dicamba was researching scholarly literature for this case. He has not personally performed a single study on its effects on the environment or bees. And again, his research focused on dicamba generally rather than on the defendants' specific products. *Id*. Defendants state that until they corrected Dr. Nieh, he was unfamiliar with the difference between OTT and non-over the top dicamba applications. *Id*. at 11.

Like some of the other expert witnesses called in this suit, Dr. Nieh has not been to Arkansas or personally witnessed plaintiff's bee operations. Moreover, Dr. Nieh has not researched plaintiff's records and practices of beekeeping. Defendants believe this disqualifies him as an expert. [Doc. 58 at 6]. They say that Dr. Nieh is not an expert in plants or weeds, and he is unfamiliar with how dicamba is used in weed management, and they add that he also is unfamiliar with where plaintiff's bees forage or on what plants they forage. [Doc. 58 at 6]. Because of all of this, defendants conclude that Dr. Nieh's

12

testimony is so attenuated, and his methodology so unreliable, that the testimony should not be admitted. *Id*. at 12-13.

Despite acknowledging that Dr. Nieh is not an expert in weeds, plaintiff seeks to admit testimony from him stating that the herbicide causes a "lack of access to pollen and nectar which the bees need for their survival." [Doc. 76 at 7]. *But see* [Doc. 58 at 1-2]. Later, however, plaintiff states that Dr. Nieh's "role in the case is to provide the jury with information about bees, while others will provide information about dicamba and weed science." *Id*. at 9. This Court will permit Dr. Nieh to testify on bees, their habitats, and their practices, including how they might behave when there is a lack of pollen and nectar. The Court will not, however, permit Dr. Nieh to speculate on any causation questions, and Dr. Nieh will not be permitted to testify on dicamba's impact on vegetation in eastern Arkansas.

The methodology Dr. Nieh applied to his investigation into insects is sufficient to be admitted, and his methodology is sufficiently reliable according to the *Daubert* and *Polski* standards. *Id*. at 4; *See* Daubert, 509 U.S. 592; *Polski*, 538 F.3d 836. Questions about the degree of certainty and weight that should be given to Dr. Nieh's research and testimony may be addressed by defendants on cross examination.

### 3. Conclusion

Applying the *Polski* factors, the Court will admit some, but not all, of Dr. Nieh's testimony. Plaintiff has successfully shown that testimony about honeybee behavior is useful and relevant to some potential facts in issue. *Polski* 538 F.3d 836 at 839. Second, Dr. Nieh is qualified to testify on honeybee behavior. *Id*. Finally, the evidence is reliably

13

based on scientific research and methodology so as to be trustworthy.  *Id*.

Dr. Nieh, however, will <u>not</u> be permitted to testify on weeds or plants because even plaintiff acknowledges that he is not qualified to testify on these matters.  [Doc. 76 at 7].  At most, Dr. Nieh would be permitted to testify as to a hypothetical situation where there was less vegetation.  He is not permitted to testify on what dicamba may or may not have done to any plants in Arkansas.

Therefore, this Court will partially grant the defendants' motion to dismiss Dr. Nieh's testimony on plants and weeds and deny defendants' motion to dismiss Dr. Nieh's testimony on honeybees and their behaviors.

### E.    Ford Baldwin, Ph.D [Doc. 62]

#### 1.  Dr. Baldwin's Experiential Background

Plaintiff's expert Dr. Ford Baldwin is a weed scientist who has been working with herbicides and studying off-target movement ("OTM") for more than 40 years.  He is Professor Emeritus in weed science at the University of Arkansas where he has spent most of his career.  [Doc. 62-2].  He has 50 years of experience with unintended effects of herbicides, including dicamba.  *Id*.

#### 2.  Motion to Exclude [Doc. 62]

Defendants seek to exclude Dr. Baldwin's testimony for two main reasons.  First, they claim that Dr. Baldwin cannot opine specifically that OTT dicamba applications reduced plaintiff's honey and wax production.  [Doc. 62 at 4].  Second, they argue that Dr. Baldwin's opinions and methodology are flawed.  [Doc. 62 at 6].

Defendants say that Dr. Baldwin's failure to comment on dicamba's potential to

harm bees is a fatal flaw in his testimony.  [Doc. 62 at 4-6].  The defendants seem to believe that each and every expert witness must be qualified to testify about causation.  *Id*. at 16. This is not true, as this Court has clarified multiple times in this opinion.  *See supra* at 2, 3, 11; *see also* Fed. R. Evid. 702, Fed. R. Evid. 702, Comment.   As the defendants themselves noted in their brief supporting the admission of Dr. Moore's testimony, an expert witness "need not offer opinions or testimony on every disputed issue to be relevant or admissible." [Doc. 72 at 8].  Testimony merely must "fit" the case and be relevant.  Fed. R. Evid. 702, Comment.  Although plaintiff must prove causation to prevail in the suit overall, there is no reason why Dr. Baldwin must prove that causation.  *Id*.  Despite defendants reiterating this argument in their reply, it does not preclude Dr. Baldwin from testifying.  [Docs. 62 and 78].

Plaintiff emphasizes that Dr. Baldwin is not testifying about the bees, so it is irrelevant whether he is an expert on them.  [Doc. 75 at 1-2].  Plaintiff reiterates that Dr. Baldwin will testify within his range of expertise, including

> (i) the chemistry, history and characteristics (drift, volatilization, etc.) of Dicamba, (ii) the use of the Dicamba Herbicides in the area of concern (which in this case is east Arkansas), (iii) the effect of the Dicamba Herbicides on broadleaf plants; and (iv) [Dr. Baldwin's] observations of that effect in the areas in which Coy's Honey Farm located its bees in the late spring/early summer of 2018.

[Doc. 75 at 2].  Defendants do not appear to dispute that Dr. Baldwin has sufficient background in these areas to testify.  *See* [Docs. 62 and 75].

Defendant's second argument that Dr. Baldwin's methodology and opinions are flawed contain five subpoints.  They include (1) that Dr. Baldwin's opinions continue to

15

fail to account for effects on bees;  (2) Dr. Baldwin draws his conclusions without inspecting plaintiff's hives or "any factual information about Plaintiff;"  (3) Dr. Baldwin admits that soybeans can recover without yield loss, and it is unclear whether native vegetation can similarly recover;  (4) Dr. Baldwin disregards his own methodology;  and (5) in forming his opinion, Dr. Baldwin conceded there are third-party sources that claim other non-dicamba auxins may also have caused similar widespread symptomology, and it is difficult to distinguish which auxin caused the symptomology.  [Doc. 62 at 6-11].

Because most of subpoint (1) merely reiterates the first main argument, this Court simply reiterates that Dr. Baldwin need not make the connection between dicamba damage and bees.  Although some connection must be made eventually, there is no reason why Dr. Baldwin must be the expert to do that.  Dr. Baldwin also is not required to form his opinion in reliance of Plaintiff's bees, since what he is testifying about is simply damage to plants in northeastern Arkansas, broadly.  Fed. R. Evid. 702.

Defendants further argue in the end of subpoint (1) and the bulk of (2) that dicamba damage cannot be traced back to their specific products.  Baldwin, however, is not testifying to that.  [Doc. 75 at 2].  At most, he will be testifying to "the use of the Dicamba Herbicides in the area of concern."  [Doc. 75 at 2].  Plaintiff has shown that Dr. Baldwin is an expert in plants and weeds in eastern Arkansas, and he frequently traveled the state examining and determining a source of plant damage during the time in question.  *Id.*  It is unclear to this court why defendants insist that Dr. Baldwin needed to know where plaintiff's hives were to make his conclusion about what was happening to vegetation in eastern Arkansas broadly.  Again, plaintiff provides sufficient evidence that hives were

16

scattered throughout Eastern Arkansas, that bees forage up to 10 miles, and Dr. Baldwin had to travel from field to field, observing even more of the landscape along his drive. *Id.* at 5-6.

Here, defendants insert one of their many references to this Court's earlier ruling in the MDL, 1:18-md-02820-SNLJ [Doc. 519], in which this Court excluded Dr. Baldwin from testifying about areas he had not visited. That opinion, however, was issued regarding witnesses who would testify in the <u>class certification stage</u>, when the Court was tasked with determining whether the same facts in one state applied to similar questions in another state. [MDL Doc. 519 at 4]. This Court found that having not accounted for differences in geography and growing conditions, Dr. Baldwin could not conclude that what happened in Eastern Arkansas necessarily happened in other states such as Nebraska, Kansas, South Dakota, and Illinois. *Id.* at 19. This Court noted: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (internal citation omitted). Here, plaintiff shows that no such analytical gap exists because Dr. Baldwin indeed visited eastern Arkansas, observing both specific fields and broader areas when he traveled from site to site. [Doc. 75 at 5-8]. Although this Court previously restricted Dr. Baldwin to testify merely about dicamba injuries in fields he visited, the Court find that his travels through eastern Arkansas satisfy that requirement. *See* [MDL 28280 Doc. 519]

Plaintiff likewise prevails against defendants' subpoint (3). Defendants argue that Dr. Baldwin's admission that soybeans can recover from dicamba exposure, and the acknowledgement that Dr. Baldwin is uncertain whether native vegetation can similarly

recover demonstrates his inability to testify to dicamba damage.  [Doc 62 at 8-9].  *See also* [Doc. 78 at 5].  Plaintiff replies that the fact in question is not crop yield, but rather the flowering of plants while in the ground.  [Doc. 75].  Plaintiff notes that Dr. Baldwin said in his deposition, "It affected flowering on a wide array of plants in eastern Arkansas for sure…it's going to affect them; I mean, numbers of flowers, duration of flowering."  *Id*. at 14.  Dr. Baldwin properly based this opinion on studies done by others cited in his report as well as his own observations.  *Id*. at 13.

Defendants argue in subpoint (4) that Dr. Baldwin disregarded his own methodology, so his investigation is unreliable.  [Doc. 62 at 9-11].  This Court disagrees.  Defendants argue that Dr. Baldwin's approach to this case did not use "anything approaching" his regular methodology.  *Id*. at 9.  This, however, is refuted, as explained in Plaintiff's response:

> A: I don't know how to separate an investigation from just a whole lot of observation. I mean, to me, an investigation would be if somebody asked me to come to their field, you know, and—and give them an opinion on what's wrong with it and—and perhaps how to deal with it… After it became so widespread, you're just driving and looking at it everywhere you go…. Once you've made enough of those, then you know what you're looking at…when you're driving around, whether you walk out in the field or not, because they all look exactly the same…And so did I apply all of that methodology to every one of those soybean fields? No, but I didn't really have to."

[Doc. 75 at 10-11].  Dr. Baldwin correctly applied his own methodology to make the initial and subsequent determinations.  [Doc. 75 at 10-11].

Defendants further argue that Dr. Baldwin did nothing to rule out other causes of damage.  [Doc. 62 at 10].  Plaintiff's responding brief, however, quotes Dr. Baldwin's deposition: "I'm looking at the big picture, and…Dicamba was what we were spraying and Dicamba's what's causing the bulk of the damage."  [Doc. 75 at 12].  He continues: "I've never seen an herbicide affect the spectrum of broadleaf plants in a drift scenario that Dicamba has."  *Id.*  Lastly, when Dr. Baldwin was asked whether he could weigh in on which formulation of herbicide was affecting the plants, he simply said "No.  I mean, it was just Dicamba."  *Id.*  As Dr. Baldwin explained:

> You're looking for symptomology.   You're looking for patterns.  You're looking for other things it could be…I may look at a rice field or something, and I—in my own mind I know what it is, but just to be sure and just to satisfy the people, I may ask a plant pathologist to come look at it or a fertility guy to come look at it….  And then from there, you start trying to figure out what happened.

[Doc 62-1 at 22] (emphasis added).  This was the methodology he says he employed when farmers requested him to investigate drift concerns.  *Id.* at 21-22.

As a final argument in subpoint (4), defendants argue that Dr. Baldwin did not assess which product was used or whether the applicator followed the product label.  [Doc. 62 at 10-11].  *See also*, [Doc. 78 at 4].  Dr. Baldwin, however, testified to basing his opinion on both personal experience and scientific reports he had access to, including those by the EPA.  [Doc 62-1 at 43-44].  Once again, however, just because causation must be shown, this does not mean that Dr. Baldwin is the expert who must show causation.

In subpoint (5), defendants argue that Dr. Baldwin's sources on off-label and illegal

use cut against the plaintiff's case.  This Court nevertheless finds that Dr. Baldwin's testimony is sufficiently rooted in the scientific method, and these concerns should be addressed through thorough cross-examination.  *See Daubert*, 509 U.S. 579 at 596.  *See also* [Doc. 75 at 4].

### 3.  Conclusion

The Court examines the testimony according to the *Polski* factors.  538 F.3d 836 at 839.  First, this Court evaluates whether Dr. Baldwin's testimony helps to determine an ultimate issue of fact.  *Id*.  Although not proving causation, Dr. Baldwin's testimony reflects the nature of Dicamba, its use in eastern Arkansas, its effects on broadleaf plants, and observations of the effects in eastern Arkansas.  [Doc. 75 at 2].

Second, this Court must determine whether the witness is qualified.  *Polski*, 538 F.3d 836 at 839.  Neither party disputes that Dr. Baldwin is qualified to testify about plants.  The defendants' only complaint is that he is not qualified to testify about bees.  Since Dr. Baldwin will not be testifying about bees, the point is moot.  [Doc. 75 at 2].

Finally, this Court must ensure the testimony is reliable.  *Polski*, 538 F.3d 836 at 839.  For the reasons discussed, the Court finds that Dr. Baldwin's testimony is reliably based on both personal and scientific observation.  Objections to the certainty of Dr. Baldwin's testimony will be permitted through "vigorous cross-examination" and "presentation of contrary evidence."  *Daubert*, 509 U.S. 579 at 596.

## II.    Motion to Exclude Testimony Relative to Collateral Source Benefits Received by Plaintiff as an Off-Set to Damages

### A.  Legal Standard

Arkansas state law incorporates a collateral source rule that prohibits the admission of evidence that third parties may have provided compensation for the same injury when evaluating damages. Arkansas Model Jury Instructions-Civil 2023. "The collateral source rule is both a principle of the substantive law of damages…, and a rule of evidence, generally precluding a defendant from eliciting or introducing evidence of such benefits or payments." Arkansas Model Jury Instructions-Civil 2023, Comment. *See McMullin v. United States*, 515 F.Supp.2d 904 (E.D. Ark. 2007); [Doc. 57]. Defendants do not deny that the Collateral Source Benefit Rule applies. They merely deny that the alleged evidence is precluded by it. [Doc. 71]. As a result, this Court will apply it to these matters as appropriate. *See*, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

There are four exceptions that allow the introduction of collateral source benefit evidence. These include:

> One, to rebut the plaintiff's testimony that he or she was compelled by financial necessity to return to work prematurely or to forego additional medical care. Two, to show that the plaintiff had attributed his condition to some other cause, such as sickness. Three to impeach the plaintiff's testimony that he had paid his medical expenses himself. And four, to show that the plaintiff had actually continued to work instead of being out of work, as claimed.

*Evans v. Wilson*, 650 S.W.2d 569, 570 (Ark. 1983). *See Parrish v. Newton*, 768 S.W.2d 17 (Ark. 1989); *Wal-Mart Stores, Inc. v. Kilgore*, 148 S.W.3d 754, 760 (Ark. Ct. App.). The admission of evidence under color of one of these four exceptions is discretionary and will only be reviewed for "manifest abuse of discretion." *Montgomery Ward & Co., Inc. v. Anderson*, 976 S.W.2d 382, 383 (Ark. 1998). *See McMullin*, 515 F.Supp.2d 904, 905.

Government benefits and private insurance traditionally have been considered collateral sources. *Montgomery Ward & Co., Inc.*, 976 S.W.2d at 383-4. *See also Bell v. Estate of Bell*, 885 S.W.2d, 877, 880 (Ark. 1994). Thus, unless some other reason requires the admission of this evidence, it should be excluded to prevent the fact finder from considering it when determining appropriate damages. This might mean that the claimant receives an excess of what is due for the tort itself, but "the law rationalizes that the claimant should benefit from the collateral source recovery rather than the tortfeasor, since the claimant has usually paid an insurance premium or lost sick leave, whereas to the tortfeasor it would be a total windfall." *East Texas Motor Freight Lines, Inc. v. Freeman*, 712 S.W.2d 456, 462 (Ark. 1986). *See also*, *Montgomery Ward & Co., Inc.,* 976 S.W.2d at 384.

## B. Application [Doc. 57]

Plaintiff moves to exclude testimony by Dr. Barry Goodwin and Clay Glasgow who state that because Coy's Honey Farm received federal benefits for drought conditions, those funds should be "credited against the damages claimed." [Doc. 57 at 2]. *See* [Doc. 57-1 at 4]. *See also*, [Doc. 71-6 at 3]. Dr. Goodwin explains that he believes this because the intent of these government programs was "to compensate for losses." [Doc. 57-1 at 4, Doc. 71-6 at 3]. He continues, "any losses have been offset or partially compensated, at least, by these indemnity payments and the disaster relief." [Docs. 57-1 at 4 and 71-6 at 3].

Although defendants argue that this testimony is actually being used to impeach plaintiff's causation claims and not establish damages, it seems clear to this Court that Dr.

22

Goodwin is exclusively testifying about damages.  *See* [Doc 71 at 4-8].  His language focuses on calculating damages and what is owed.  Indeed Dr. Goodwin himself states, "I am not making any assumptions or…presentation about the <u>causality</u> of the relationship between Dicamba and honey production."   [Doc. 57-1 at 6] (emphasis added).  Furthermore, he states that he formed his opinion "as an economist."  [Doc. 71-6 at 3].  Regarding the connection between rainfall and honey production, Dr. Goodwin said, "I believe that there is a presumption that there is a link between rainfall and honey production.  That's been presumed by the government in establishing this coverage.  And so, the compensation was made purely on the basis of deficient rainfall."  [Doc. 57-1 at 5, Doc. 71-6 at 4].  Dr. Goodwin never states or makes the case that he himself, as an expert, believes that rainfall affects honey production.  He mentions only that it's the government's basis for the compensation program, and it is based on 65 years of data.  *Id*.

Defendants cite to *Moore* to say that collateral benefits are only relevant when related to injuries caused by defendant. 43 S.W.3d 204, at 210.  This is a misconstruction of the law which actually says in full:

> As a general rule, benefits received by the plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce the defendant's liability for damages. This rule holds even though the benefits are payable to the plaintiff because of the defendant's actionable conduct and even though the benefits are measured by the plaintiff's losses.

*Id*.  At no point does the collateral source rule limit itself to injury caused by the defendant when read in full.

Defendants cite much of Richard Coy's testimony for the reason why they need to

admit the collateral source evidence in order to impeach him.  They wish to show that other difficulties may have caused reduced honey production.  They go so far as to say that "[p]laintiff admits it received these payments because factors like drought and rainfall reduced the amount of honey and wax Plaintiff's bees produced."  [Doc. 71 at 1]. They cite no relevant part of the record for this claim.  Instead, they cite to parts of the testimony where Richard Coy discusses communications he may have had with other scientists about dicamba damage.  *Id*. at 2.  In reading the attached exhibits and rereading the Second Amended Complaint, the Court finds that at no point has Mr. Coy admitted that drought was responsible for vegetation damage.  At most, plaintiff has provided documentation merely showing he accepted payments from a crop insurance program for drought. Some of those payments are not even relevant, however, as they were awarded for drought outside of the areas represented in this suit.  *See* [Doc. 71-2].  *See also* [Docs. 61-3 at 13-16, 20-21; 61-15; 61-16; and 61-17 at 41-43].

Defendants have not clearly explained the purpose of the governmental benefits being brought up in this trial for impeaching the plaintiff.  Defendants have only mentioned the importance of this information for their expert's damages calculation.  Therefore, evidence of the benefits will be excluded pursuant to the Collateral Source Benefit Rule of Arkansas.

### C. Conclusion

Defendants are correct that the collateral source rule does not apply if the evidence is offered to prove something other than damages.  [Doc. 71].  Because Dr. Goodwin seeks to introduce this evidence exclusively regarding the calculation of damages, the plaintiff's

motion will be granted, and all evidence related to the collateral source benefits in calculations will be excluded.  Although plaintiff raised similar concerns about Mr. Clay Glasgow, no evidence was provided regarding his testimony.  To the extent he testifies on damages, the motion will be granted.  All other topics of his testimony will be reconsidered as needed.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion *in limine* to exclude the testimony of Eric P. Webster, Ph.D., [Doc. 55] is DENIED.

**IT IS HEREBY ORDERED** that plaintiff's motion *in limine* to exclude testimony of Dwayne Moore, Ph.D., [Doc. 56] is DENIED.

**IT IS HEREBY ORDERED** that plaintiff's motion *in limine* to exclude testimony relative to collateral source benefits [Doc. 57] is GRANTED as to defendants' expert testimony on damages.

**IT IS HEREBY ORDERED** that defendants' motion *in limine* to exclude testimony of James Nieh, Ph.D., [Doc. 58] is GRANTED in part and DENIED in part.

**IT IS HEREBY ORDERED** that defendants' motion to *in limine* to exclude testimony of Ford Baldwin, Ph.D., [Doc. 62] is DENIED.

Dated this 27th day of February, 2025.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE